Filed 11/25/13  P. v. Vogel CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ERICK JOHN VOGEL,<br><br>    Defendant and Appellant. | F064302<br><br>(Super. Ct. No. 1401530)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Thomas D. Zeff, Judge.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found appellant Erick John Vogel guilty of first degree murder (Pen. Code, §§ 187, subd. (a)/189)[1] and first degree burglary (§ 459). The jury also found true the personal use of a deadly and dangerous weapon enhancement (§ 12022, subd. (b)). Vogel admitted out-on-bail enhancements attached to both counts (§ 12022.1). He earlier entered a no contest plea to violating a protective order (§ 273.6). The trial court sentenced Vogel to an indeterminate term of 25 years to life for first degree murder, plus a determinate term of three years on the enhancements. The trial court stayed the remaining imposed terms. Various fines were imposed and restitution ordered.

On appeal, Vogel contends that the trial court abused its discretion in denying his request for substitute counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) and erred in admitting statements Vogel made to an officer in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). He also contends there is insufficient evidence to find that the killing was the result of premeditation or deliberation. He finally contends that, because victim restitution is punitive, imposition of a restitution order on judicially determined facts violated his constitutional right to a jury trial and the requirement of proof beyond a reasonable doubt. We disagree and affirm.

## STATEMENT OF THE FACTS

Katherine Voelker and Vogel lived together and had two children, a girl in April of 2005 and a boy in October of 2006. In March of 2009, Voelker and the children moved out of their residence, and the following month they moved into a motel room. Voelker and Vogel were in a custody dispute and Vogel had recently commenced legal proceedings to obtain joint custody.

On April 22, 2009, Carrie Sacher, who was staying in the motel room down from Voelker's, woke during the early morning hours to the sound of glass breaking. She then

---

[1]    All statutory references are to the Penal Code unless otherwise stated.

heard children screaming and then a woman scream. The woman's scream was "really intense" and then suddenly stopped. Sacher heard more glass breaking. The children stopped screaming and then cried. Sacher saw a man pass by her window, walking briskly. The man got into a dark-colored car and sped off through a chain-link fence that blocked the motel lot from another business lot.

Sacher opened her room door and went to the area where she saw broken glass. She looked into the window and saw two young children sitting on the edge of the bed crying. Another motel occupant climbed through the window to unlock the motel door from the inside. A woman was lying on the bed gasping for air. Sacher and other motel guests noticed a cut in the women's neck region. Sacher picked up the children and took them to the doorway of her room. The little girl told Sacher several times, "That was my daddy."

Police officers arrived and found Voelker on the bed with a large laceration in her chin and throat area and multiple fresh puncture wounds on her chest and abdomen areas. She was still alive, but gasping for air and losing consciousness. A community service officer spoke with the children and observed that they were scared and crying. The girl said to the officer, "My daddy came through the window and hurt mommy." A crowbar was found inside the motel room under the broken window.

Voelker was transported to a hospital, where she died. The cause of death was found to be loss of blood from multiple stab wounds. One stab wound was eight inches deep.

On April 25, 2009, Sheriff's Deputy David Thompson was working with a canine partner when he saw Vogel hiding in the vegetation at a park. Thompson twice directed Vogel to surrender. When he did not get a response, Thompson warned Vogel that the dog would bite him and he ordered Vogel to put his hands up. Vogel began to comply and then refused, so Thompson commanded the dog to apprehend Vogel. The dog bit

3.

Vogel in the wrist and forearm and pulled him out of the vegetation. Vogel was then handcuffed and paramedics called.

Another deputy, Deputy Green transported Vogel to a hospital. En route, while seated in the backseat of the patrol vehicle, which was pulled over in a parking lot, Sergeant Marc Nuno asked Vogel about his injuries. During their conversation, Vogel said, "Man, I fucked up, [Deputy Nuno]" and "I loved that girl."

Photos were taken of Vogel at the hospital. Sacher picked Vogel's picture out of a photo lineup as the person who she saw walk by her motel window, but she was not 100 percent sure.

Swabs of bloodstains from the motel room's window frame and drapery fabric contained DNA consistent with Vogel.

## DISCUSSION

### I. *MARSDEN* MOTION

Vogel contends that the trial court's *Marsden* inquiry was inadequate before denying his motion for new counsel because "significant factual issues were not explored [or] resolved." We disagree.

*Procedural Record*

On the date set for the preliminary hearing, Vogel filed a written *Marsden* motion. On the form motion, Vogel said he had "not receiv[ed] adequate representation by counsel" and checked boxes that counsel had failed and/or refused to do various things critical to his defense: to confer with him; to subpoena favorable witnesses; to perform critical investigation; to secure expert witnesses; to prepare and file motions; and to present evidence at motion/writ hearings. Vogel also checked a box labeled "other," and then handwrote:

> "[H]ave not received discovery, have not talked to psychologist, or investigators. And when I call for him the secretary[] want to no [*sic*] why I want to talk to him in details and thats [*sic*] none of th[ei]r [business] 5-6-

4.

10 at 320 to be exact[.] I have a high profile case and cannot talk my [business] over the phone to be recorded."

The trial court immediately held a hearing on the motion. After reviewing the written motion, the trial court asked Vogel if he had "any additional statements … to make with regard to th[e] *Marsden* motion?" Vogel replied:

"Yeah. I mean, [counsel] came and seen me Friday. He's like telling me that the investigation don't start until after the prelim exam and that's today. [¶] You are supposed to investigate all that before. You got to come in here with everything investigated, you know? I got some witnesses that I want to help me. [¶] … [W]e're bumping heads or something.… [¶]…[¶] … I've been here 14 months, you know? I haven't got nothing. I've talked to him twice in 14 months for my case. Two minutes. Five minutes. You know what I mean?"

In response to the trial court's questioning, defense counsel stated that he had been practicing with the Public Defender's Office for almost seven years and had tried serious cases, including other homicide clients. Defense counsel stated he had been representing Vogel since the inception of the case. When asked what he had done in his representation of Vogel, defense counsel stated he had: (1) reviewed all discovery, along with a summer intern and co-counsel, in anticipation of the preliminary hearing; (2) contacted Vogel numerous times as to whether there were any witnesses that needed to be interviewed, but Vogel had not provided any names; (3) asked Vogel numerous times if there were any witnesses to the incident, but Vogel told him there were not; and, (4) in response to Vogel's request that defense counsel investigate his state of mind at the time of the event for "a possible commitment to BHRS," defense counsel had Vogel sign a medical release. He got Vogel's medical records and reviewed them. Defense counsel refuted Vogel's claim that he left defense counsel messages at the office, but defense counsel had spoken to Vogel the Friday before for about 45 minutes and "none of these issues were raised." Defense counsel did not know of any conflicts between Vogel and himself and that the two of them had "open communications since the inception of the case."

5.

The trial court reviewed the form motion again and noted that defense counsel had addressed various issues. When asked about Vogel's complaint that defense counsel had failed or refused to secure expert witnesses, defense counsel stated that he did not think there were any expert witnesses necessary. The only possible useful expert witness would have been on the issue of Vogel's mental state, but according to defense counsel, based on the review of his medical records, no such expert witness was needed.

As for failing or refusing to file motions critical to the defense, defense counsel stated that, "[a]t this point, no motions that I believe are necessary for the preliminary hearing have been filed, but not needed as well." Defense counsel did state that they would be making a *Miranda* motion concerning the statement Vogel made.

As for the allegation that Vogel had not received discovery, defense counsel stated that his office sends discovery to a defendant when the defendant requests it, and Vogel never made such a request. Vogel claimed, however, that he had requested it from the secretary "[m]ore than once."

As for the claim that Vogel had not talked to psychologists or investigators, defense counsel acknowledged that Vogel had not been interviewed "at this point" by a psychologist, but determined none was needed after his medical records were received. And because Vogel had not given defense counsel any witness information, no interview with an investigator was needed either.

When asked if there was anything else for the trial court to consider, Vogel said, "No." The trial court then denied the motion, finding defense counsel had "properly represented [Vogel] and will continue to do so."

Vogel then asked if he could "fire" defense counsel. The trial court explained that, if Vogel wished to hire private counsel, he could do so, but he would not get his choice of appointed counsel. !(RT 9-10)! Vogel then asked to put the matter "off for a couple weeks," so he could try to retain private counsel. After further discussion, the trial court reluctantly agreed Vogel could have two weeks to obtain private counsel. The trial court

6.

noted that, in its view, Vogel's request was "not timely" and "frivolous," and that "the only reason" for granting the continuance was "the seriousness nature of the charge." !(RT 5/17/10 10-15)!

Following the continuance, the same defense counsel subsequently represented Vogel through trial and at sentencing. !(CT 24; RT 5/17/10 15; RT 17)!

*Applicable Law and Analysis*

*Marsden* motions are subject to the following well-established rules. Under *Marsden*, when a defendant in some manner moves to discharge current counsel, the trial court's duty is to inquire as to the reasons for the dissatisfaction and exercise its discretion in deciding whether to replace counsel. (*Marsden, supra,* 2 Cal.3d at p. 124; *People v. Lucky* (1988) 45 Cal.3d 259, 281.) A defendant is entitled to relief if he can show inadequate representation or that the attorney-client relationship is irreparably broken down. (*People v. Smith* (1993) 6 Cal.4th 684, 696; *People v. Crandell* (1988) 46 Cal.3d 833, 854, abrogated by *People v. Crayton* (2002) 28 Cal.4th 326, 364-365.) The trial court should appoint new counsel only when a proper showing under *Marsden* has been made. (*People v. Smith, supra,* at p. 696.)

A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense. (See *People v. Hamilton* (1989) 48 Cal.3d 1142, 1162.) "Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.' 'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.'" (*People v. Welch* (1999) 20 Cal.4th 701, 728-729.)

"Denials of *Marsden* motions are reviewed under an abuse of discretion standard. [Citation.] Denial 'is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's

7.

right to assistance of counsel. [Citations.]' [Citation.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.)

In *People v. Silva* (2001) 25 Cal.4th 345, 365-366, the trial court read a document submitted by defendant that outlined the reasons for his *Marsden* motion. The trial court then asked defendant three times to state the grounds for his request to replace his attorney, and the trial court did not interrupt defendant's explanation. Defense counsel was then asked to respond to defendant's allegations. The Supreme Court found the court's actions satisfied the requisite duty of inquiry. (*People v. Silva, supra,* at p. 367.)

In *People v. Hines* (1997) 15 Cal.4th 997, 1021, the defendant made three *Marsden* motions. In the first, when defendant asserted that his attorney was "'not doing his job,'" the trial court asked defendant for specifics and then asked counsel to comment. (*People v. Hines, supra,* at p. 1022.) In the second hearing, the trial court also questioned defendant closely about the basis for his complaints. (*Id.* at pp. 1022-1023.) In a third hearing, the defendant asserted there was "'confusion'" between him and his attorneys, and the court again asked defendant to elaborate. When defendant had difficulty doing so, the court suggested that defendant take some time to think about specific reasons for his dissatisfaction with counsel and bring them to the court's attention. (*Id.* at p. 1023.)

The Supreme Court concluded:

> "On each occasion, the court repeatedly asked defendant to clarify the reasons for his dissatisfaction with counsel, and thereafter questioned defendant's lead attorney at length to determine whether defendant's allegations warranted counsel's replacement. Although the third hearing was not as thorough as the first two, the court again made great efforts to have defendant explain the nature of the difficulties defendant was having with counsel. When defendant was unable to do so, the court gave defendant as much time as needed to formulate his reasons for wanting different counsel. In short, at each of the three *Marsden* hearings the trial court fully complied with its duty to ascertain the nature of the problems defendant claimed he was having with his appointed counsel." (*People v. Hines, supra,* 15 Cal.4th at p. 1024.)

The same can be said here.  For each alleged deficiency in representation voiced by Vogel, the trial court invited responses from defense counsel.  After each complaint was addressed, the trial court asked Vogel if he had anything to add, to which Vogel said he did not. "To the extent there was a credibility question between defendant and counsel at the hearing, the court was 'entitled to accept counsel's explanation.'" (*People v. Smith, supra,* 6 Cal.4th at p. 696.)  We find that the trial court conducted an appropriate *Marsden* inquiry and reject Vogel's claim to the contrary.

## II.     *MIRANDA* VIOLATION

Vogel argues that the incriminating statements he made to Sergeant Nuno -- "Man, I fucked up" and "I loved that girl" -- was the result of interrogation under *Miranda.*  We disagree.

### *Procedural Record*

Prior to trial, Vogel moved to preclude incriminating statements he made to Sergeant Marc Nuno.  After Vogel was arrested and placed into a patrol car, the following colloquy occurred between Sergeant Nuno and Vogel:

"NUNO:  Erick,

"VOGEL:  Yeh.

"NUNO:  How're you doin?

"VOGEL: Um …

"NUNO:  Not good?  No?  What's wrong?

"VOGEL: Dog chewed me up.

"NUNO:  How bad's your arm?

"VOGEL: It's … can't feel it.

"NUNO:  Do you need to go to the hospital?

"VOGEL:  No.

"NUNO: What'd they say how bad his arm was? What'd they say how bad his arm was? Does it need stitches or anything? You remember me, Erick?

"VOGEL: Yeh. I know you. How're you doing Marc?

"NUNO: Not too bad, buddy. Hangin in there?

"VOGEL: Man, I fucked up, Marc.

"NUNO: You know ….

"VOGEL: I loved that girl."

Prior to testimony on the statements, the trial court held a hearing, pursuant to Evidence Code section 402, in which Deputy David Thompson, Deputy Brandon Green, and Sergeant Nuno testified.

Deputy Thompson testified that, on April 25, 2009, he and his canine partner found a person suspected of being Vogel hiding in the ivy at the park. After he identified himself and announced that he had a police dog, the deputy warned the person that the dog would bite him if he did not surrender. The person did not respond. After two more announcements to surrender, Deputy Thompson began walking toward to the ivy. Deputy Thompson saw the person raise his hands, as if to surrender, and then drop them quickly. Thinking the person might have a weapon, Deputy Thompson released the dog and commanded him to apprehend the person. The dog bit the person on the upper left back and then his forearm/wrist area. Deputy Thompson and the dog pulled the person out of the ivy and handcuffed him. The person identified himself as Vogel.

According to Deputy Thompson, paramedics checked Vogel's injuries and advised him that the injuries were fairly minor in nature but that, if they wished, he could be transported to the hospital by the deputies. Deputy Thompson then placed Vogel into Deputy Green's patrol vehicle for transport to the hospital.

Deputy Green testified that he had a tape recorder with him in his patrol vehicle. With Vogel seated in the back of the patrol vehicle Green activated the recorder and

placed it behind the passenger seat headrest. Deputy Green and Deputy Thompson traveled caravan to the hospital. En route to the hospital, Deputy Thompson spoke with Sergeant Nuno, who then instructed Green to stop at a restaurant parking lot, halfway between the park and the hospital.

Sergeant Nuno testified that he wanted to see Vogel's injuries to determine whether he should be taken to the hospital or directly to jail. At the restaurant parking lot, Sergeant Nuno opened the door to Deputy Green's patrol vehicle and spoke to Vogel. Sergeant Nuno testified that he wanted to see Vogel's injuries and ask how he was doing. Sergeant Nuno had been told by Deputy Green that there was a tape recorder in the patrol vehicle.

After hearing argument from the parties, the trial court denied Vogel's motion and admitted his incriminating statements. The trial court determined that, while Vogel was clearly under arrest and had not been advised of his rights, the statements were made within the "first 30 seconds" of Sergeant Nuno's conversation with Vogel and Sergeant Nuno's questions "were strictly asked for purposes of determining if the defendant was in need of medical care and was not seeking to elicit incriminating information." The trial court determined that there was no interrogation at that point for purposes of *Miranda*. The trial court determined that Vogel's "volunteering or making statements that were not directly responsive to those questions was … no fault of the officer. And I find no evidence that the officer was attempting to trick Mr. Vogel into making these statements, which are sought to be excluded."

At trial, the taped conversation between Vogel and Sergeant Nuno was played for the jury.

*Applicable Law and Analysis*

*Miranda* admonitions -- advising a suspect of his or her right to remain silent, to the presence of an attorney and, if indigent, to appointed counsel -- must be given and an individual in custody must knowingly and intelligently waive those rights before being

11.

subjected to either express questioning or its "functional equivalent." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300-301; *People v. Ray* (1996) 13 Cal.4th 313, 336.) *Miranda* applies only to "custodial interrogation." (*Rhode Island v. Innis, supra,* at p. 298; *Miranda, supra,* 384 U.S. at p. 444.) "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda, supra,* at p. 444.)

"When there is *custody*, but not *interrogation*, *Miranda* does not apply." (*People v. Harmon* (1992) 7 Cal.App.4th 845, 853.) "'Interrogation' consists of express questioning, or words or actions on the part of the police that 'are reasonably likely to elicit an incriminating response from the suspect.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 993.) Whether particular questioning amounts to an interrogation depends on the "'total situation,'" including the length, place and time of the questioning, the nature of the questions, the conduct of the police and all other relevant circumstances. (*People v. Terry* (1970) 2 Cal.3d 362, 383, disapproved on another ground in *People v. Carpenter* (1997) 15 Cal.4th 312, 383, superseded by statute on another ground as noted in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106.)

When reviewing a trial court's decision denying a motion to suppress statements purportedly obtained in violation of the defendant's rights under *Miranda,* we defer to the court's resolution of disputed facts if supported by substantial evidence. (*People v. Stansbury* (1995) 9 Cal.4th 824, 831; *People v. Siripongs* (1988) 45 Cal.3d 548, 575.) Based on those facts, as found, and the undisputed facts, we independently review the trial court's rulings. (*People v. Weaver* (2001) 26 Cal.4th 876, 918.)

There is no question, and indeed the People do not dispute, that Vogel, who was handcuffed and placed by sheriff's deputies in the back of the patrol car, was in "custody" for purposes of *Miranda.* The issue, therefore, is simply whether the questions posed to him while in custody constituted an interrogation.

12.

We find that no interrogation occurred. The conversation Sergeant Nuno initiated with Vogel was unrelated to the killing of Voelker. Sergeant Nuno simply asked Vogel, who was just bitten by a dog, about his injuries, whether Vogel remembered him, and whether Vogel was "[h]angin in there." Not all conversations between a police officer and a suspect constitutes interrogation. (*People v. Ray, supra,* 13 Cal.4th at p. 338.) "The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response." (*People v. Clark* (1993) 5 Cal.4th 950, 985, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

In *People v. Roldan* (2005) 35 Cal.4th 646, the defendant was standing in the jail food line when he saw a deputy he knew. The defendant asked the deputy, "'"What's happening ….?"'" The deputy recognized the defendant and asked if he was going to stay out of trouble. The defendant responded, "'"Yeah, it was nothing. I don't know why they are bothering with all this court. I am guilty. I [stabbed] that guy in the yard."'" Later when the deputy transported the defendant back to a high security area, the defendant asked why he was being moved. The deputy said it was for his own protection. The defendant replied, "'"It is no big deal. I don't know why. I am probably going to face the death penalty anyway."'" Our Supreme Court held that defendant's statements were volunteered and not made in response to interrogation. (*Id.* at pp. 735-736, overruled on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

Here, the questions Sergeant Nuno asked of Vogel cannot "reasonably be construed as calling for an incriminating response." (*People v. Clark, supra,* 5 Cal.4th at p. 985.) We agree with the trial court that Vogel's response to Sergeant Nuno's questions was not the product of an interrogation under *Miranda*.

13.

III.     SUFFICIENCY OF THE EVIDENCE

Vogel contends that there was insufficient evidence to support the jury's finding that the murder was willful, deliberate, and premeditated.  We disagree.

"Review on appeal of the sufficiency of the evidence supporting the finding of premeditated and deliberate murder involves consideration of the evidence presented and all logical inferences from that evidence in light of the legal definition of premeditation and deliberation ….   Settled principles of appellate review require us to review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt.  [Citations.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)  The hurdle to secure a reversal is just as high when the prosecution's case depends on circumstantial evidence.  (*People v. Stanley* (1995) 10 Cal.4th 764, 792.)  As long as there is reasonable justification for the findings made by the trier of fact, a reviewing court's opinion that contrary findings might also have been reasonable does not require a reversal.  (*Id.* at p. 793.)

We determine the issue of whether a murder was willful, deliberate, and premeditated under familiar principles.  "'[W]illful'" means intentional; "'deliberate'" means formed and arrived at as a result of careful thought and weighing of considerations for and against the proposed course of action; and "'premeditated'" means considered beforehand.  (*People v. Perez, supra,* 2 Cal.4th at p. 1123.)  "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.  [Citations.]  However, the requisite reflection need not span a specific or extended period of time." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)  "[P]remeditation can occur in a brief period of time.  'The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at

14.

quickly ….' [Citations.]" (*People v. Perez, supra,* at p. 1127.) Premeditation and deliberation can thus occur in rapid succession. (*People v. Bloyd* (1987) 43 Cal.3d 333, 348.) The act of obtaining a weapon is evidence of planning consistent with a finding of premeditation and deliberation. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081-1082.) The method of killing alone "can sometimes support a conclusion that the evidence sufficed for a finding of premeditated, deliberate murder." (*People v. Memro* (1995) 11 Cal.4th 786, 863-864.) For instance, an execution-style shooting at close range may establish premeditation and deliberation (*People v. Bloyd, supra,* at p. 348); the assailant's use of a firearm against a defenseless person may show sufficient deliberation (*People v. Bolin* (1998) 18 Cal.4th 297, 332-333); and firing at vital body parts shows preconceived deliberation (*Ibid.*; *People v. Thomas* (1992) 2 Cal.4th 489, 518.)

Vogel disputes the existence of the premeditation and deliberation, claiming those findings cannot be made without resorting to speculation and conjecture. We disagree with Vogel and believe there is ample evidence from which a reasonable jury could conclude Vogel acted willfully and with premeditation and deliberation.

With respect to planning, Vogel, a little after 2:00 a.m., armed himself with a crowbar and knife and drove to the motel room where Voelker was staying. He did not enter through the door to talk to Volker, but shattered the window and entered the room. Sacher, next door, heard screaming, first coming from the children and then "really intense" screaming coming from a woman. As for deliberation, Vogel inflicted several numerous stab wounds to Voelker, including to her neck and abdomen areas. Voelker was undoubtedly surprised by Vogel's entry through her window at night and was unarmed. Vogel fled the scene by speeding away through a chain-link fence and down an alley to avoid detection.

There was ample evidence showing that the killing "occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely, supra,* 35 Cal.4th at p. 543.) We reject Vogel's claim to the contrary.

15.

IV.    VICTIM RESTITUTION

At sentencing, the trial court ordered Vogel to pay actual restitution, pursuant to section 1202.4, subdivision (f), in the amount of $7,500 for Voelker's funeral and burial costs to the California Victim Compensation and Government Claims Board.  !(RT 632; CT 304)!   He now contends that the restitution is punishment and, as such, cannot be imposed on judicially determined facts without violating the Sixth Amendment, citing the recent United States Supreme Court case of *Southern Union Co. v. United States* (2012) 567 U.S. ___ [132 S.Ct. 2344; 183 L.Ed.2d 318] (*Southern Union*), and *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), as well as *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*).  We disagree.

In *Apprendi, supra,* 530 U.S. at p. 490, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  As the Court explained in *Blakely, supra,* 542 U.S. at p. 303, "[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (Some italics omitted.)  It follows that a judgment may not "inflict[] punishment that the jury's verdict alone does not allow."  (*Blakely, supra,* at p. 304.)

In *Southern Union*, the Court held *Apprendi* applies to the imposition of criminal fines.  (*Southern Union, supra,* 132 S.Ct. at p. 2356.)  The statutory fine imposed in *Southern Union* was $50,000 for each day of violation; the trial court, rather than the jury, determined the number of days of violation.  Because the amount of the fine was directly tied to the number of days of violation, the Court held the trial court's factual finding as to the number of days of violation ran afoul of *Apprendi*.  (*Southern Union, supra,* at p. 2356.)

*Southern Union* does not support Vogel's argument.  First, unlike the criminal fine in *Southern Union*, the restitution to the California Victim Compensation and

16.

Government Claims Board is direct victim compensation. The California Constitution provides, in relevant part, that "[r]estitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss." (Cal. Const. art. I, § 28, subd. (b)(13)(B).) Subdivision (f) of section 1202.4 implements the constitutional directive to require restitution for crime victims. A court must order "full restitution unless it finds compelling and extraordinary reasons for not doing so, and states them on the record." (§ 1202.4, subd. (f).)

Neither *Southern Union*, *Apprendi* nor *Blakely* have any application to direct victim restitution, because victim restitution is not a criminal penalty. (*People v. Pangan* (2013) 213 Cal.App.4th 574, 585.) Instead, victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits; it is not increased "'punishment.'" (*Ibid.*; see also *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1185; *People v. Millard* (2009) 175 Cal.App.4th 7, 35 ["the primary purpose of a victim restitution hearing is to allow the People to prosecute an expedited hearing before a trial court to provide a victim with a civil remedy for economic losses suffered, and not to punish the defendant for his or her crime"]; accord *People v. Harvest* (2000) 84 Cal.App.4th 641, 645, 650.)

Moreover, the restitution statute itself characterizes victim restitution awards as civil (see § 1202.4, subd. (a)(3)(B) [victim restitution imposed pursuant to subdivision (f) "shall be enforceable as if the order were a civil judgment"]) and federal cases addressing the issue have likewise concluded that a restitution hearing does not implicate the Sixth Amendment right to a jury trial. (*People v. Chappelone, supra,* 183 Cal.App.4th at p. 1184 [collecting numerous federal cases holding that, because victim restitution does not constitute increased punishment for crime, judges may find the facts necessary to impose a restitution order].)

We conclude that the trial court did not err in imposing a restitution order without a jury determination of the restitution amount, and reject Vogel's claim to the contrary.

17.

**DISPOSITION**

The judgment is affirmed.

_____

Franson, J.

WE CONCUR:

_____

Cornell, Acting P.J.

_____

Peña, J.

18.